1

2

3

4

5

6

7

8

9          UNITED STATES DISTRICT COURT
         WESTERN DISTRICT OF WASHINGTON
10                    AT TACOMA

11
   ROBERT E. GARCIA,
12                                              CASE NO. C10-5463-RBL-JRC
                            Plaintiff,
13                                              REPORT AND RECOMMENDATION
          v.
14                                              Noted for March 11, 2011
   MICHAEL J. ASTRUE, Commissioner of
   Social Security Administration,
15
                            Defendant.
16

17          This matter has been referred to Magistrate Judge J. Richard Creatura pursuant to 28

18 U.S.C. § 636(b)(1) and Local Magistrate Judge Rule MJR 4(a)(4); and, as authorized by

19 Mathews, Secretary of H.E.W. v. Weber, 423 U.S. 261, 271-72 (1976).  This matter has been

20 fully briefed. (See ECF Nos. 12, 13, 14.)

21
          After considering and reviewing the record, the undersigned finds that the ALJ erred
22
   when making findings regarding plaintiff's severe impairments and erred in his evaluation of the
23
   medical evidence and in his assessment of plaintiff's credibility. He made findings without
24
   substantial evidence, incorrectly characterized medical evidence, made erroneous conclusions
25
   based on the medical evidence, failed to discuss significant probative evidence, and failed to
26

provide specific and legitimate reasons supported by substantial evidence in the record for his rejection of medical evidence supplied by treating and examining medical sources.

BACKGROUND

Plaintiff, ROBERT E. GARCIA, was born on May 16, 1963, and was 42 years old on his alleged disability onset date. (Tr. 117.) His last relevant earnings occurred in 2000, when he earned $15,367.40 from the Department of Social and Health Services (hereinafter "DSHS") for providing care for his handicapped girlfriend. (Tr. 31.) He stated that he was a care provider for about 13 years. (Id.) Although plaintiff continued to be in a relationship with this girlfriend from 2000 until 2005, plaintiff ceased being her care provider in 2000 following a disagreement that the police reported as domestic violence. (Tr. 32.) Plaintiff indicated that if he hadn't broken up with his girlfriend, and if there had been no domestic violence charge, he might have "be[en] still doing that." (Id.) However, he also indicated that "there would be somebody else doing the work now because I, my back has gotten unhealthy and I can't do the lifting that I used to be able to do." (Tr. 33.)

At a hearing held on May 21, 2009, plaintiff testified that he "was self-medicating for my COPD [chronic obstructive pulmonary disease]. I didn't even know I had a lot of these diseases . . . . [b]ut since I've [] [] started getting the insurance, I just started getting on the maintenance program and started realizing how sick I was." (Tr. 32-33.)  Plaintiff testified that "in 2005 . . . . I went into a major depression . . . . [t]hat's what got me into the whole DSHS, realizing that I had bipolar disease." (Tr. 33.)

Plaintiff testified that he worked as a flagger for a couple of years around 2004 but he "quit doing that because [he] couldn't stand for the eight hours" because of his back (Tr. 34.) At the May 21, 2009 hearing, plaintiff testified that his back still presents limitations: "I went and

helped somebody move furniture the other day. I couldn't work more than an hour and a half, my

back was just burning, so tired that I had to stop working." (Tr. 35.) He also testified that "if I sit

down for eight hours my back starts hurting  . . . .  if I stand for just a couple hours my back

will start aching  . . . .  it's just unbearable pain." (Tr. 35.) Plaintiff testified that after an hour

and a half of working, he had to sit down, and that sitting down "help[ed] relieve the pain." (Tr.

37.) "[A]fter about 20 minutes [plaintiff] can get up and walk around, but [he] can't do any

lifting." (Id.) Plaintiff testified that he thought he was incapable of a night watchman job because

he "can't sit down," "[i]t'd drive me nuts." (Tr. 38.) Plaintiff also indicated a diagnosis for

hepatitis C about a year before his May, 2009 hearing. (Tr. 54.)

Plaintiff describes scrapping as a hobby. (Id.) He takes apart broken televisions, VCRs,

personal computers, and other devices, "for the spare metal," such as copper. (Tr. 39-40.)

However, he describes difficulties with his "eye/hand coordination [and] [his] depth perception

is bad, [and] [he] tend[s] to jab [him]self with the screwdriver." (Tr. 41.)

Plaintiff reported at the hearing that he had "been drug free  . . . .  for 19 months," with

the exception of drinking on his birthday "last year." (Tr. 42.) Plaintiff testified that "I've been

doing drugs for a long time," but that an arrest for possession of methamphetamine "was kind of

a slap in the face." (Tr. 43.) Plaintiff "did 60 days in treatment in lieu of jail." (Tr. 44.) In

October, 2007, he went into treatment with Pioneer Center North. (Id.)

Plaintiff stated at the May 21, 2009 hearing that he has difficulties working because of his

mental health issues. (Tr. 46.) He stated that he "think[s] about a paragraph ahead of what [he's]

saying," and that he "tend[s] to jump the gun a lot and a lot of times that gets [him] into safety

trouble." (Id.) He also testified that he has sleep problems due to his racing thoughts. (Tr. 52-53.)

He stated that he "can stay up sometimes for three days without sleeping." (Tr. 53.)

Plaintiff stated at the May 21, 2009 hearing that he has lived alone in a mobile home since October, 2008. (Tr. 47.) He testified that he "scrap[s], read[s], watch[es] TV," as well as "clean[s] the house, [and] cook[s]." (Id.)

Plaintiff testified that he can only read for about an hour or so, and at that point, he "start[s] seeing double and triple." (Tr. 48-49.) He testified that he wouldn't be able to complete a job taking apart computers at work. (Tr. 49.)

At the May 21, 2009 hearing, a vocational expert testified. (Tr. 58-60.) The vocational expert testified, among other things, that if plaintiff were going to miss two days of work on a regular basis that he would not be able to maintain employment. (Tr. 59-60.) He also testified that if plaintiff needs breaks to accommodate "his eyes go[ing] bad after a half-hour for about an hour where he wouldn't be able to focus," plaintiff would not be able to maintain employment. (Tr. 60.)

<u>PROCEDURAL HISTORY</u>

Plaintiff protectively filed applications for Social Security and Supplemental Security Income disability benefits on February 2, 2006. (Tr. 117-21.) He alleges that he has been disabled since September 25, 2005. (Id.) His applications were denied, and he did not appeal this denial. (Tr. 68-71.)

Plaintiff protectively filed new applications for Social Security and Supplemental Security Income disability benefits on October 25, 2006, again alleging that he became disabled on September 25, 2005. (Tr. 122-29.) His applications were denied initially and upon reconsideration. (Tr. 72-75, 77-80.) Pursuant to plaintiff's request, a hearing was held on May 21, 2009, before Administrative Law Judge John Bauer, (hereinafter "the ALJ"). (Tr. 27-61.) On June 25, 2009, the ALJ issued a written decision in which he made numerous findings. (Tr. 14-

26.) The ALJ found that plaintiff met the required insured status requirements and had not

engaged in substantial gainful activity since September 25, 2005. (Tr. 19.) The ALJ found that

plaintiff had the severe impairments of bipolar disorder and chronic obstructive lung disease

(also known as chronic obstructive pulmonary disease, "COPD"). (Id.) The ALJ found that

plaintiff did not have an impairment meeting or medically equaling one of the relevant listed

impairments. (Tr. 20.) The ALJ also found that plaintiff had the residual functional capacity to

perform light work, but "should avoid concentrated exposure to fumes, odors, dusts, gases, and

poor ventilation." (Tr. 21.) Mentally, the ALJ found that plaintiff could "do simple, routine tasks

and have occasional contact with coworkers and the public." (Id.)

Finally, the ALJ found plaintiff capable of performing jobs that existed in significant

numbers in the national economy, and therefore found plaintiff not disabled. (Tr. 25-26.) The

Appeals Council denied plaintiff's request for review on April 29, 2010, making the June 25,

2009 written decision the final decision of defendant Commissioner subject to judicial review.

(Tr. 2-6.) On July 6, 2010, plaintiff filed a complaint seeking review of the ALJ's written

decision. (ECF No. 3.) Plaintiff contends that the following alleged errors require reversal and/or

remand of this matter:

1) The ALJ erred in failing to consider properly all of the functional limitations caused
   by all of plaintiff's impairments.
2) The ALJ erred in failing to consider properly the medical evidence.
3) The ALJ erred in failing to consider properly plaintiff's testimony.
4) The ALJ erred in his assessment of plaintiff's residual functional capacity.
5) Defendant failed to meet his burden to show that plaintiff could perform any work in
   the national economy.

(ECF No. 12.) Plaintiff also contends that this matter should be remanded for an award of

benefits. (Id. at 24.)

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

STANDARD OF REVIEW

Plaintiff bears the burden of proving disability within the meaning of the Social Security Act (hereinafter "the Act"). Meanel v. Apfel, 172 F.3d 1111, 1113 (9th Cir. 1999) (*citing* Johnson v. Shalala, 60 F.3d 1428, 1432 (9th Cir. 1995)). The Act defines disability as the "inability to engage in any substantial gainful activity" due to a physical or mental impairment "which can be expected to result in death or which has lasted, or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). Plaintiff is disabled under the Act only if plaintiff's impairments are of such severity that plaintiff is unable to do previous work, and cannot, considering plaintiff's age, education, and work experience, engage in any other substantial gainful activity existing in the national economy. 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B); see also Tackett v. Apfel, 180 F.3d 1094, 1098-99 (9th Cir. 1999).

Pursuant to 42 U.S.C. § 405(g), this court may set aside the Commissioner's denial of social security benefits if the ALJ's findings are based on legal error or not supported by substantial evidence in the record as a whole. Bayliss v. Barnhart, 427 F.3d 1211, 1214 n.1 (9th Cir. 2005) (*citing* Tidwell, 161 F.3d at 601). "Substantial evidence" is more than a scintilla, less than a preponderance, and is such "'relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Magallanes v. Bowen, 881 F.2d 747, 750 (9th Cir. 1989) (*quoting* Davis v. Heckler, 868 F.2d 323, 325-26 (9th Cir. 1989)); see Richardson v. Perales, 402 U.S. 389, 401 (1971).

REPORT AND RECOMMENDATION - 6

DISCUSSION

1) The ALJ erred in failing to consider properly all of plaintiff's impairments, specifically, impaired vision, back pain, obesity, impulse control disorder, personality disorder and attention deficit hyperactivity disorder (ADHD).

The ALJ must provide "clear and convincing" reasons for rejecting the uncontradicted opinion of either a treating or examining physician or psychologist. Lester v. Chater, 81 F.3d 821, 830 (9th Cir. 1995) (*citing* Baxter v. Sullivan, 923 F.2d 1391, 1396 (9th Cir. 1991); Pitzer v. Sullivan, 908 F.2d 502, 506 (9th Cir. 1990)); see also Edlund v. Massanari, 253 F.3d 1152, 1158-59 (9th Cir. 2001) ("the ALJ erred in failing to meet, either explicitly or implicitly, the standard of clear and convincing reasons required to reject an uncontradicted opinion of an examining psychologist") (*citing* Lester v. Chater, 81 F.3d 821, 830 (9th Cir. 1995)).  Even if a treating or examining physician's opinion is contradicted, that opinion "can only be rejected for specific and legitimate reasons that are supported by substantial evidence in the record." Lester, 81 F.3d at 830-31 (*citing* Andrews v. Shalala, 53 F.3d 1035, 1043 (9th Cir. 1995)). The ALJ can accomplish this by "setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings." Reddick v. Chater, 157 F.3d 715, 830-31 (9th Cir. 1998) (*citing* Magallanes, supra, 881 F.2d at 751). In addition, the ALJ must explain why his own interpretations, rather than those of the doctors, are correct. Reddick, supra, 157 F.3d at 831 (*citing* Embrey v. Bowen, 849 F.2d 418, 421-22 (9th Cir. 1988)). However, the ALJ "need not discuss *all* evidence presented."  Vincent on Behalf of Vincent v. Heckler, 739 F.2d 1393, 1394-95 (9th Cir. 1984) (per curiam).  The ALJ must only explain why "significant probative evidence has been rejected."  Id. (*quoting* Cotter v. Harris, 642 F.2d 700, 706-07 (3d Cir. 1981)).

1    The ALJ found plaintiff's bipolar disorder and chronic obstructive lung disease to be

2  severe. (Tr. 19-20.) The ALJ did not find plaintiff's hepatitis C, impaired vision, attention deficit

3  hyperactivity disorder, impulse control disorder, personality disorder or obesity to be severe.

4  (Id.) The following is a brief review of each of the ALJ's findings of non-severity.

5           a.   Hepatitis C

6       The ALJ included the following in his written decision:

7
8           The claimant was diagnosed with hepatitis C in 2008 (internal citation to
            Exhibit 22F). That claimant was unable to receive hepatitis C treatment prior to
9           being clean and sober for 12 months. At the hearing, the claimant testified that
            he will soon begin treatment. The claimant's hepatitis C is a non-severe
10          impairment as liver function tests were only mildly abnormal and it is expected
            that treatment will be successful in preventing significant symptoms from
11          developing.

12  (Tr. 19.) The Court finds this to be a proper finding and finds ALJ's consideration of plaintiff's

13  hepatitis C to be proper.

14           b.   Impaired vision

15       The ALJ also included the following in his written decision:

16
17          The claimant's vision problems due to a right visual field cut are also non-
            severe. The medical evidence supports that the claimant's vision is correctible
18          to 20/25 (internal citation to Exhibit 14F).  The claimant testified that he has
            chronic back pain. However, the evidence does not contain any evidence
19          pertaining to a back disorder. As such, the claimant's alleged back disorder is
            not medically determinable.  As required by the regulations, the claimant's
20          non-severe impairments have been considered in the residual functional
            capacity.
21
22  (Tr. 19-20.) The ALJ cites Exhibit 14F for his conclusion regarding plaintiff's vision

23  being correctible to 20/25. (Id.) The ALJ appears to be relying on comment by a non-

24  examining, non-physician that "vision is correctible to 20/25 OS per MER ('medical

25  evidence of record')." (Tr. 320.) While this comment by the non-examining, non-

26  physician indicates that plaintiff's vision is 20/50 in his left eye ("*oculus sinister*", *i.e.*,

1   "OS") and that his vision in his left eye is correctible to 20/25, it also indicates that

2   plaintiff's vision in both eyes ("*oculus uterque*", *i.e.*, "OU") is 20/200, the highest end

3   of the chart (Tr. 320). <u>See also</u>, <u>e.g.</u>, 42 U.S.C.S. § 416(i)(1)(B) ("the term 'blindness'

4   means central visual acuity of 20/200 or less in the better eye with the use of a

5   correcting lens"). There does not appear to be any evidence in the record suggesting that

6   plaintiff's vision overall is correctible to 20/25, in fact, it appears to be "greater than

7   20/200 [] in his right eye," ("*oculus dexter*", *i.e.*, "OD"). (Tr. 234.) This conclusion is

8   similar to that made by Dr. Ashwin Rao, M.D., who assessed plaintiff's vision in his

9   right eye, with lenses, at 20/200. (Tr. 290.) In addition, the ALJ apparently failed to

10  consider evidence that plaintiff suffers from "right strabismus [colloquially known as

11  'crossed eyes']." (Tr. 234.) Therefore, the conclusions by the ALJ regarding plaintiff's

12  visual impairments are without substantial evidence. <u>See Bayliss</u>, <u>supra</u>, 427 F.3d at

13  1214 n.1; <u>see also Magallanes</u>, <u>supra</u>, 881 F.2d at 750. (<u>See also</u> Tr. 41-42, 48-49, 219-

14  221, 234, 320.)

15

16          c.   Back Disorder, back pain

17          The ALJ states that "the evidence does not contain any evidence pertaining to a back

18  disorder." (Tr. 20.) However, the Court notes that the record includes a report in September,

19  2007 that plaintiff "fell on to back approx 5 feet Friday. Increasing pain ever since  . . . .  Pain

20  located lateral to spine near right scapula." (Tr. 370, 368-70.) Plaintiff reported extreme pain in

21  the emergency room, level 10, and was prescribed vicodin by Dr. Stanley M. Feero, M.D. (Tr.

22  370, 371.) Plaintiff was assessed as having a strain of the thoracic spine. (Tr. 369, 400-04.) The

23  ALJ appears not to have evaluated this evidence, and his conclusion that there was no evidence

1   pertaining to a back disorder is unwarranted. See Bayliss, supra, 427 F.3d at 1214 n.1; see also

2   Magallanes, supra, 881 F.2d at 750.

3           d.   Obesity

4       Plaintiff contends that it was legal error for the ALJ not to find plaintiff's obesity to be

5   severe. (See ECF No. 12, pp. 14-15.)

6

7       Dr. Leyton Jump, M.D., assessed plaintiff in April, 2008 as significantly obese at 246

8   pounds, when plaintiff gained 44 pounds in a year. (Tr. 385.) The ALJ does not mention

9   plaintiff's obesity. There does not appear to be any indication in the record that plaintiff's weight

10  has more than a minimal effect on plaintiff's ability to engage in substantial gainful activity.

11  (See, e.g., Tr. 30-57.) However, in combination with plaintiff's chronic obstructive lung disease,

12  which the ALJ found to be severe, plaintiff's obesity may have had more than a minimal effect.

13  See Smolen v. Chater, 80 F.3d 1273, 1290 (9th Cir. 1996) (quoting Yuckert v. Bowen, 841 F.2d

14  303, 306 (9th Cir. 1988) (adopting Social Security Ruling "SSR" 85-28)) ("An impairment or

15  combination of impairments can be found 'not severe' only if the evidence establishes a slight

16  abnormality that has 'no more than a minimal effect on an individual[']s ability to work'"). This

17  evidence of plaintiff's obesity is significant, probative evidence that the ALJ should have

18  discussed before rejecting. See Vincent, supra, 739 F.2d at 1394-95.

19          e.   Impulse Control Disorder and Personality Disorder

20      Plaintiff contends that it was legal error for the ALJ not to find plaintiff's impulse control

21

22  disorder and personality disorder to be severe.  (See ECF No. 12, pp. 14-15.)

23

24      On October 1, 2007, Daniel M. Neims, Psy. D., (hereinafter "Mr. Neims"), diagnosed

25  plaintiff with, among other things, impulse control disorder, NOS ("not otherwise specified");

26  and personality disorder NOS, by history. (Tr. 352.) Mr. Neims opined that plaintiff suffered

1   from marked impairment. (Tr. 354.) Similarly, on October 27, 2008, Mr. Neims diagnosed

2   plaintiff with impulse control disorder, NOS; and personality disorder NOS. (Tr. 342.) Again,

3   Mr. Neims assessed some of plaintiff's limitations as marked. (Tr. 344.) In addition, Mr. Neims

4   found plaintiff's insight and impulse control to be poor. (Tr. 348.) Although the ALJ discusses an

5   opinion by Mr. Neims regarding marked limitations, see infra, section 2.d., he does not mention

6   either of Mr. Neims' diagnoses of impulse control disorder or personality disorder. (Tr. 24, 342,

7   352.) These diagnoses by Mr. Neims were significant probative evidence that the ALJ should

8

9   have evaluated and discussed in his decision. See Vincent, supra, 739 F.2d at 1394-95.

10          f.    Attention Deficit Hyperactivity Disorder (ADHD)

11          Finally, on December 27, 2006, Terilee Wingate, Ph.D., (hereinafter "Ms. Wingate"),

12   opined that plaintiff suffered from the "established" diagnoses of bipolar disorder, type I,

13   recently manic with psychotic features; ADHD by history; and Amphetamine Dependence, in

14   remission." (Tr. 255.) Although the ALJ discusses in his written decision an opinion by Ms.

15   Wingate regarding marked limitations, see infra, section 2.a., he does not mention Ms. Wingate's

16

17   "established" diagnosis of ADHD by history. (Tr. 24, 255.)

18          Similarly, in February, 2007, the mental health professionals at Behavioral Health

19   Resources, (hereinafter "BHR"), assessed plaintiff as chronically mentally ill with, among other

20   disorders, ADHD, NOS. (Tr. 334.) This assessment was affirmed by the supervising nurse

21   practitioner. (Id.; see also Tr. 421-67.) The ALJ fails to mention this evidence by the mental

22

23   health professionals at BHR.

24          In addition, on January 25, 2008, BHR Nurse Marne Nelson, A.R.N.P. (hereinafter

25   "Nurse Nelson") assessed plaintiff as having attention deficit/hyperactivity disorder (ADHD).

26   (Tr. 467.) Subsequently, on January 23, 2009, Nurse Nelson indicated her "belie[f] that

[plaintiff] may more appropriately [be] diagnosed with a recurrent depression and attention deficit/hyperactivity disorder with residual hyperactivity than with bipolar disorder." (Tr. 452.) Although the ALJ selectively cites to this exhibit to support his conclusion regarding plaintiff's mental health improvement, he neglects to mention either of Nurse Nelson's indications regarding ADHD within this exhibit. (See Tr. 22 (citations to Exhibit 23F.))

The various assessments and diagnoses of ADHD by Ms. Wingate, the BHR mental health professionals, and Nurse Nelson, are significant probative evidence that the ALJ should have discussed in his decision. See Vincent, supra, 739 F.2d at 1394-95.

The ALJ erred when making findings regarding plaintiff's severe impairments and failed to discuss significant probative evidence. See supra, section 1.b-f.  Especially when considered in light of the errors by the ALJ in his review of the medical evidence, see infra, section 2, the Court cannot conclude that his errors were harmless when assessing severe limitations.

2)   The ALJ erred in failing to consider properly the medical evidence.

In general, more weight is given to a treating physician's opinion than to the opinions of those who do not treat the claimant.  Lester, 81 F.3d at 830.  Similarly, an examining physician's opinion is "entitled to greater weight than the opinion of a nonexamining physician." Id. (citations omitted); see also 20 C.F.R. § 404.1527(d). A non-examining physician's opinion may not constitute substantial evidence by itself. Lester, 81 F.3d at 831 (citations omitted). "In order to discount the opinion of an examining physician in favor of the opinion of a nonexamining medical advisor, the ALJ must set forth specific, legitimate reasons that are supported by substantial evidence in the record." Van Nguyen v. Chater, 100 F.3d 1462, 1466 (9th Cir. 1996) (citing Lester, supra, 81 F.3d at 831).

REPORT AND RECOMMENDATION - 12

1    "A treating physician's medical opinion as to the nature and severity of an individual's

2    impairment must be given controlling weight if that opinion is well-supported and not

3    inconsistent with other substantial evidence in the case record." Edlund v. Massanari, 253 F.3d

4    1152, 1157 (9th Cir. 2001) (citing SSR 96-2p, 1996 SSR LEXIS 9); see also 20 C.F.R. § 416.902

5    (nontreating physician is one without "ongoing treatment relationship"). The decision must

6    "contain specific reasons for the weight given to the treating source's medical opinion, supported

7    by the evidence in the case record, and must be sufficiently specific to make clear to any

8    subsequent reviewers the weight the adjudicator gave to the [] opinion." SSR 96-2p, 1996 SSR

9    LEXIS 9. However, "[t]he ALJ may disregard the treating physician's opinion whether or not

10   that opinion is contradicted." Batson v. Commissioner of Social Security Administration, 359

11   F.3d 1190, 1195 (9th Cir. 2004) (quoting Magallanes v. Bowen, 881 F.2d 747, 751 (9th Cir.

12   1989)).

13          The ALJ must provide "clear and convincing" reasons for rejecting the uncontradicted

14   opinion of either a treating or examining physician or psychologist.  Lester v. Chater, 81 F.3d

15   821, 830 (9th Cir. 1995) (citing Baxter v. Sullivan, 923 F.2d 1391, 1396 (9th Cir. 1991); Pitzer v.

16   Sullivan, 908 F.2d 502, 506 (9th Cir. 1990)); see also Edlund v. Massanari, 253 F.3d 1152, 1158-

17   59 (9th Cir. 2001) ("the ALJ erred in failing to meet, either explicitly or implicitly, the standard

18   of clear and convincing reasons required to reject an uncontradicted opinion of an examining

19   psychologist") (citing Lester, supra, 81 F.3d at 830).  Even if a treating or examining physician's

20   opinion is contradicted, that opinion "can only be rejected for specific and legitimate reasons that

21   are supported by substantial evidence in the record."  Lester, supra, 81 F.3d at 830-31 (citing

22   Andrews, supra, 53 F.3d at 1043). The ALJ can accomplish this by "setting out a detailed and

REPORT AND RECOMMENDATION - 13

thorough summary of the facts and conflicting clinical evidence, stating his interpretation

thereof, and making findings." Reddick, supra, 157 F.3d at 830-31.

    a. Terilee Wingate, Ph.D., Treating Psychologist (November 4, 2003 –
     December 27, 2006)

  The Court already has discussed some of the opinion evidence supplied by Ms. Wingate,

including her "established" diagnosis of ADHD by history, which was not evaluated or discussed

by the ALJ. See supra, section 1.f (see also Tr. 24, 255).  On November 4, 2003, Ms. Wingate

evaluated plaintiff. (Tr. 278-287.) She conducted a number of tests, and hand wrote many

narratives, quotes from plaintiff and specific assessments, in her report. (Id.) Ms. Wingate

diagnosed plaintiff with mood disorder, NOS, hypomanic; polysubstance dependence, in

remission; and alcohol abuse (Tr. 178-83.) Ms. Wingate's notes include the following

handwritten attachment:

>  [Plaintiff was] born in Mass - .  .  .  .  Father died when he was 11 yo –
> parents ran a restaurant and lounge. Grew up around adults. Great family – got
> along well [with his] parents. Mother remarried – he never got along [with]
> him – told him he was no good. He rebelled against him.
>  [Plaintiff] joined Marines to escape the home. He finished h.s. in
> Marines. Attend[ed] tech. college briefly. In Marines 4 yrs – gen[eral]
> discharge – using cannabis – sent to brig & discharged. Worked in fast food,
> but, got easily bored. Traveled 2 yrs selling soap. Did siding sales. Moved CA
> in 1984 to escape drug use. Did motorcycle sales but got pneumonia, moved
> back to CA. Worked 14 years for a moving co[mpany], quit due to asthma.
> Quit 2 yrs ago. He does some work occasionally – odd jobs, telephone sales,
> labor ready. Also got paid to be a caregiver for girlfriend – got DV charge.
> Last worked at fair – ran a ride.

(Tr. 282.)

  On July 18, 2005, Ms. Wingate again evaluated plaintiff. (Tr. 268-77.) Once again, one

can glean much from reviewing Ms. Wingate's handwritten notes, such as that plaintiff viewed

himself as "'smart' but [] a slacker." (Tr. 268.) Her assessment includes the unique note that

plaintiff was in an accident in May, 1995 in which he potentially lost consciousness and ended

up with "his head [] trapped between seat and window  .  .  .  .  [although he] doesn't recall

accident." (Id.) Ms. Wingate's handwritten attachment is as extensive as the one of November 4, 2003, and includes that plaintiff indicated that "he gets bored [with] jobs and he won't go to work." (Tr. 272.)

Following her examination, and assessment of plaintiff's ability to complete certain cognitive tasks, Ms. Wingate, on July 18, 2005, diagnosed plaintiff with "bipolar disorder, type I, depressed recently but usually manic; and amphetamine dependence, in remission." (Tr. 269.) She also noted the need to rule out the possible diagnoses of ADHD, as well as alcohol and cannabis abuse. (Id.) She indicated that plaintiff's "mood swings cont[inue], even when clean." (Id.) On this occasion, Ms. Wingate noted plaintiff's symptoms included some that were "marked," including depressed mood, [decreased] sleep, negative thoughts; expression of anger [indicated by] rage outbursts; motor agitation [indicated by] talking very fast, rambling; hyperactivity [indicated by] grandiose [thoughts] – he's writing 2 novels, zero sleep for days; [as well as marked] physical complaints [of] vision problems, asthma." (Id.) Ms. Wingate also indicated plaintiff's "marked" "global illness: based on intensity and pervasiveness of all symptoms and impairment of functioning [in which Ms. Wingate specified plaintiff's] racing thoughts, thoughts can be ahead of what he's saying' [and his] constantly moving." (Id.)

On July 18, 2005, Ms. Wingate furthermore stated that plaintiff suffered severe impairment in his ability to respond appropriately to and tolerate the pressures and expectations of a normal work setting, and suffered marked impairment in his ability to learn new tasks, relate appropriately to co-workers and supervisors, interact appropriately in public contacts, and control physical or motor movements and maintain appropriate behavior. (Tr. 270.) She noted that his girlfriend of 17 years had him move out because she was afraid of him. (Id.)

REPORT AND RECOMMENDATION - 15

1    On December 29, 2005, Ms. Wingate evaluated plaintiff for at least the third time. (Tr.

2  267-67.) She gave plaintiff a Mental Status Examination and assessed plaintiff's GAF ("Global

3  Assessment of Functioning") at 45, indicating "serious" impairment in functioning. (Tr. 266.)

4  See also, e.g., DSM-IV (Diagnostic and Statistical Manual of Mental Disorders, 4th ed.), p. 32.

5  During this December 29, 2005 assessment, Ms. Wingate noted plaintiff's suicidal ideation (Tr.

6  265), and his "vegetative symptoms [of] increasing sleep" (Tr. 266). At this time, Ms. Wingate

7  diagnosed plaintiff with bipolar disorder, type I, recently mixed; and amphetamine dependence,

8  in remission." (Tr. 262.) She noted that plaintiff's symptoms "continue when clean and sober"

9  (Tr. 262) and further indicated that "with appropriate treatment, he may be able to work but has

10  not changed since last evaluation – treatment may take some time" (Tr. 264).

11    On December 27, 2006, Ms. Wingate again evaluated plaintiff. (Tr. 254-260.) She noted

12  that he presented unkempt and unshaven. (Tr. 259.) She also noted that he was suffering from

13  decreased sleep, and was primarily manic, with increased appetite. (Id.) She assigned him a GAF

14  of 50 (id), and diagnosed him with "bipolar disorder, type I, with psychotic features, recently

15  manic; ADHD by history; and amphetamine dependence, in remission" (Tr. 255).

16    Regarding the evidence provided by Ms. Wingate, the ALJ included the following in his

17  decision:

On December 27, 2006 Terilee Wingate, Ph.D., completed a Department of
Social and Health Services (DSHS), check the box, psychological evaluation.
Dr. Wingate noted that the claimant had marked limitations in his ability to
interact appropriately in public contacts and respond appropriately to and
tolerate the pressures and expectations of a normal work setting. Although Dr.
Wingate noted that the claimant had marked limitations in social factors, she
noted that the claimant was pleasant, friendly, and could easily make friends
(internal citation to Exhibit F). . . . . I have granted little probative weight to
the DSHS evaluation[] as [it] is not as well documented and as thorough as the
consultative evaluations [performed by the State agency medical consultants].
Additionally, the DSHS evaluators did not have the opportunity to review the
claimant's record as the State agency consultants did.

REPORT AND RECOMMENDATION - 16

1
2
3
4

(Tr. 24.) The Court already has discussed Ms. Wingate's "established" diagnosis of ADHD by history, see supra, section 1.f., and the ALJ's error in failing to discuss this evidence. See Vincent, supra, 739 F.2d at 1394-95.

5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

Regarding Ms. Wingate's evaluations and opinion as a whole, the ALJ implies that Ms. Wingate only examined plaintiff on one occasion, as opposed to recognizing her status as a treating medical source with an ongoing treatment relationship with plaintiff. See 20 C.F.R. § 416.902. In addition, the ALJ's characterization of Ms. Wingate's evaluations as "a Department of Social and Health Services (DSHS), check the box, psychological evaluation" was inappropriate in light of Ms. Wingate's pages of hand written narratives (Tr. 256, 263, 270, 272, 280-82), multiple tests (Tr. 258-60, 265-67, 273-77, 283-87) and multiple evaluations of plaintiff on November 4, 2003, July 18, 2005, December 29, 2005 and December 27, 2006. (Tr. 254-87.) In addition, even though Ms. Wingate may have noted that plaintiff was pleasant, friendly, and could easily make friends (see Tr. 24), this assessment does not negate her assessment of marked limitations, and does not provide legitimate reasons to give only little probative weight to her pages of opinions and assessments over the course of over three years. See Lester, supra, 81 F.3d at 830-31. Furthermore, based on a review of the relevant record, the Court finds that the ALJ's conclusion that Ms. Wingate's evaluations are "not as well documented and as thorough as the consultative evaluations [performed by the State agency medical consultants]" is erroneous and without substantial evidence. See Bayliss, supra, 427 F.3d at 1214 n.1; see also Magallanes, supra, 881 F.2d at 750. Ms. Wingate's evaluations were well-documented and very thorough. See supra, section 1.a, pp. 14-18. For the aforementioned reasons, the Court concludes that the ALJ did not provide legitimate reasons "supported by substantial evidence in the record" for the little probative weight he gave to the evaluations by Ms. Wingate, treating psychologist.  See

REPORT AND RECOMMENDATION - 17

1    Lester, supra, 81 F.3d at 830-31; see also Bayliss, supra, 427 F.3d at 1214 n.1; Magallanes,

2    supra, 881 F.2d at 750.

3          b.  Dr. Lisa Cosgrove, D.O.

4          On April 21, 2006, Dr. Lisa Cosgrove, D.O., (hereinafter "Dr. Cosgrove"), conducted a

5    psychiatric evaluation of plaintiff. (Tr. 222-30.) She noted that plaintiff was living in his car, that

6    "he needed redirection once after being given directions back to the evaluation room, and [that]

7    his gait was quite fast." (Tr. 222.) When asked how he came to be living in his car at the

8    Walmart parking lot, plaintiff "was clearly, and very evidently, tangential and circumstantial."

9    (Id.) Dr. Cosgrove indicated that plaintiff complained about being hyper and stated that "I can't

10   hold a 9-5 job; I get bored and leave." (Id.) Dr. Cosgrove's notes on plaintiff's history of present

11   illness include that "he used heroin, cocaine, and alcohol" prior to 2003, and that "he did use

12   drugs intravenously." (Tr. 224.) Her notes also indicate that plaintiff voluntarily underwent

13   alcohol treatment in 1995 "because 'I suddenly found that I had my hands around my girlfriend's

14   throat.'"(Id.) Dr. Cosgrove quoted plaintiff as an example of his tangentiality:

15
16          "I dream of being a motivational speaker. It's all I read. And I write, too. A
             year ago I was going through this depression thing (the claimant can't describe
17           it,) and I was going to write a book, and then I decided to inject heroin in my
             vein and kill myself, but I didn't do it because a friend came over."
18

19   (Tr. 225.) Dr. Cosgrove also includes plaintiff's statements that he "was a straight-A kid until

20   [he] started using drugs," and that he was charged with forgery once because "a person gave me

21   a check, and I kind of knew it was stolen, but I cashed it anyway." (Id.)

22          Dr. Cosgrove indicates plaintiff's denial of any history of psychotic disorders, and his

23   denial of any family psychiatric history (Tr. 225), although the Court notes his family history of

24   suicide (see Tr. 419). Based on her mental status examination, Dr. Cosgrove indicated that

25
26

1   plaintiff was malodorous, but made good eye contact. (Tr. 227.) She also noted that plaintiff

2   presented "mildly psychomotor retarded, moving back and forth in his chair at times with his

3   torso." (Id.) In addition, plaintiff presented with a manic mood, with a broad and expansive

4   affect. (Id.) As noted many, many times throughout the record, Dr. Cosgrove noted plaintiff's

5   "pressured speech," which was tangential, at times circumstantial, and at times requiring

6   redirection. She also notes that plaintiff did not appear to have any insight into his need for

7   redirection. (Id.) Dr. Cosgrove also noted that plaintiff "showers rarely," and "does not brush his

8   teeth at all." (Tr. 228.)

9

10      Dr. Cosgrove diagnosed plaintiff with, among other disorders, bipolar disorder, type I,

11  "present episode manic." (Tr. 228-29.) Her prognosis of plaintiff was "guarded." (Tr. 229.) Dr.

12  Cosgrove further indicates that although plaintiff has a treatable condition, and could, with help

13  regarding management of his medications, "have stability within six month to one year," she also

14  indicates that "what should be appreciated, however, is individuals with bipolar 1 disorder

15  typically cannot tolerate the stress of a full-time work environment." (Id.) She explains that this:

16

17          is due to the disorder itself, i.e., despite when they are compliant, [there exist]
            breakthrough episodes of mania and or major depression causing impairment,
18          not only in social and occupational functioning due to difficulty, for example,
            with memory, focus concentration, and task completion; but [also] an increase
19          in goal-directed behaviors without being able to complete tasks; high risk
            behavior such as promiscuity, or in the claimant's case, drug use; and some
20          interactions with the legal system, in this case with this claimant, forgery and
            domestic violence. Provided that the claimant would be compliant with
21          treatment, the likelihood that he could achieve stabilization in one year and be
            reevaluated, as he does have a fairly solid work history by his report, for
22          possible part time work in a low-stress environment in one year, would be fair
            to good.
23

24

25  (Id.) Finally, Dr. Cosgrove indicated that even though plaintiff did remarkably well on his mental

26  status examination, "the likelihood, however, that he could maintain that concentration,

REPORT AND RECOMMENDATION - 19

1    persistence, and pace in a competitive work environment with even that stress of having to relate

2    with others, whether that be the public, coworkers or supervisors, would be, on a more probable-

3    than-not basis, poor. (Tr. 230.)

4          The ALJ includes the following in his decision regarding Dr. Cosgrove:

5

6          On April 21, 2006, a mental consultative evaluation was conducted by Lisa
           Cosgrove, D.O. Dr. Cosgrove diagnosed the claimant with bipolar disorder,
7          alcohol dependence, marijuana abuse, and polysubstance dependence in
           reported remission. Although the claimant was noted to have done remarkably
8          well on the mental status examination, Dr. Cosgrove opined that the likelihood
           that the claimant could maintain concentration, persistence and pace in a
9          competitive work environment was probably poor. To support her opinion, Dr.
           Cosgrove noted that claimant's active mania, tangentiality, pressured speech,
10         decreased need for sleep, difficulty staying on task, and potential stress from
           having to relate with the public, coworkers, and/or supervisors. Dr. Cosgrove
11         recommended reevaluation (Exhibit 4F). On December 23, 2006, another
           mental consultative evaluation was conducted by James Parker, M.D. Dr.
12         Parker diagnosed the claimant with polysubstance dependence, in remission,
           episodic alcohol dependence, and bipolar disorder. Dr. Parker noted that the
13         claimant did not appear to be manic during the examination. He opined that the
           claimant was capable of performing simple, repetitive tasks (Exhibit 8F). I
14         have granted little probative weight to Dr. Cosgrove's opinion as it is internally
           inconsistent. Dr. Cosgrove noted that the claimant did remarkably well on the
15         mental status examination; however, she opined that he could not maintain
           concentration, persistence and pace. I have granted more weight to Dr.
16         Parker's opinion as it is supported by his thorough examination.

17

18   (Tr. 24.) First, although the ALJ's assertion that Dr. Cosgrove recommended

19   reevaluation technically is correct, this statement is misleading when taken out of

20   context. Dr. Cosgrove actually stated that:

21

22         Provided that the claimant would be compliant with treatment, the likelihood
           that he could achieve stabilization in one year and be reevaluated, as he does
23         have a fairly solid work history by his report, for possible part time work in a
           low-stress environment in one year, would be fair to good.

24

25   (Tr. 119 (emphases added).)

26

REPORT AND RECOMMENDATION - 20

Secondly, and more importantly, the ALJ was incorrect to conclude that Dr. Cosgrove's opinion is internally inconsistent because although Dr. Cosgrove noted that plaintiff did remarkably well on the mental status examination, she opined that he could not maintain concentration, persistence and pace. As explained by Dr. Cosgrove in her opinion, "although, admittedly [plaintiff] did remarkably well on the Mental Status Examination, the likelihood, however, that he could maintain that concentration, persistence, and pace in a competitive work environment with even the stress of having to relate with others, whether that be the public, coworkers, or supervisors, would be, on a more probably-than-not basis, poor." (Tr. 230.) Therefore, the ALJ's conclusion that Dr. Cosgrove's opinion was inconsistent internally was erroneous and without substantial evidence in the record as a whole. See Bayliss, supra, 427 F.3d at 1214 n.1; see also Magallanes, supra, 881 F.2d at 750. For these reasons, the ALJ's decision to grant little probative weight to Dr. Cosgrove's opinion due to its alleged internally inconsistency was legal error and was not based on legitimate reasons supported by the record as a whole. See Bayliss, supra, 427 F.3d at 1214 n.1; see also Magallanes, supra, 881 F.2d at 750.

Finally, in his written decision, the ALJ "granted more weight to Dr. Parker's opinion [than to Dr. Cosgrove's opinion] as it is supported by his thorough examination. (Tr. 24.) The Court has carefully reviewed both the opinions by Drs. Cosgrove and Parker. Although Dr. Parker's opinion does appear to be supported by a thorough examination, the Court concludes that the opinion by Dr. Cosgrove clearly is much more thorough and the Court furthermore concludes that the opinion by Dr. Cosgrove appears to be supported by a more thorough examination than that conducted by Dr. Parker. In addition, the Court finds that Dr. Parker's conclusion that plaintiff could perform simple, repetitive tasks contradicts much of the evidence in the record. For

REPORT AND RECOMMENDATION - 21

these reasons, the Court concludes that the ALJ's decision to grant more weight to Dr.

Parker's opinion than to Dr. Cosgrove's opinion is based on reasons that are not

legitimate and are not supported by the record as a whole. See Bayliss, supra, 427 F.3d

at 1214 n.1; see also Magallanes, supra, 881 F.2d at 750.

> c.  Nurse Mary E. Langley, A.R.N.P.

Nurse Mary E. Langley, A.R.N.P., (hereinafter "Nurse Langley"), conducted a

psychiatric evaluation of plaintiff on February 23, 2007. (Tr. 417-20.) She noted plaintiff's sleep

problems and that plaintiff "denies a history of psychotic symptoms other than when under the

influence of substances." (Tr. 417.) Nurse Langley noted that plaintiff "has a great deal of

difficulty following through with scheduled tasks and taking medicine three times a day was very

difficult for him." (Tr. 418.) She noted plaintiff's reported "six to twelve cans of caffeinated soda

per day." (Id.) In addition, Nurse Langley noted that "plaintiff states he has been abstinent from

methamphetamine abuse since 2002," (id.) however, plaintiff's testimony makes it unclear

whether or not this statement was truthful (see Tr. 43; but see Tr. 469). Nurse Langley reported

that plaintiff has a family history of suicide, as he "had one uncle who committed suicide by a

gunshot wound to the head." (Tr. 419.) She reported stressing the importance of decreasing

caffeine and "minimize[ing] any substance abuse," and assessed plaintiff's GAF at 40. (Tr. 420.)

The ALJ fails to mention any of this evidence in his written decision, other than to

mention plaintiff's difficulty with medication compliance and keeping appointments, and to use

this evidence to support a detrimental determination regarding plaintiff's credibility, see also

infra, section 3. (Tr. 22.) Nurse Langley's psychiatric evaluation of plaintiff on February 23,

2007 is significant, probative evidence. See Vincent, supra, 739 F.2d at 1394-95.

1

2

     d.  Daniel M. Neims, Ph. D., Examining Psychologist (October 1, 2007 – October

       27, 2008)

3

4

     On October 1, 2007, Mr. Neims evaluated plaintiff. (Tr. 350-58.) He wrote pages of

5

handwritten narratives (Tr. 351, 353), and conducted a mental status examination (Tr. 356-58).

6

In addition, as previously discussed, see supra, section 1.e., p. 10-11, Mr. Neims diagnosed

7

plaintiff with Impulse Control Disorder, NOS; Bipolar Disorder, NOS, by history; Personality

8

Disorder, NOS, by history; and Polysubstance Dependence, episodic." (Tr. 352.) His October 1,

9

2007 evaluation includes four areas of markedly severe limitations by plaintiff, including

10

cognitive ability to perform routine tasks, and ability to relate appropriately to co-workers and

11

supervisors, respond appropriately to and tolerate the pressure and expectations of a normal work

12

setting and to control physical or motor movements and maintain appropriate behavior. (Tr. 354.)

13

Mr. Neims also indicated two areas in which plaintiff suffered marked to severe impairment,

14

including the cognitive ability to exercise judgment and make decisions, and the social ability to

15

interact appropriately in public contacts. (Id.) In his evaluation on October 1, 2007, Mr. Neims

16

remarked that plaintiff presented "anxious and agitated [and] his difficulties with impulse control

17

apparently [are] longstanding." (Id.) He also concluded that plaintiff "does not seem intoxicated

18

[on] this date, yet appears to be processing excessively fast." (Id.)

19

     On October 27, 2008, Mr. Neims again evaluation plaintiff. (Tr. 340-49.) His evaluation

20

again includes hand-written narratives (Tr. 341, 343-45) and results from the mental status

21

examination he conducted of plaintiff (Tr. 346-49). Mr. Neims notes plaintiff's inappropriate

22

affect (Tr. 348), poor insight and poor impulse control (id.), as well his chronic pain (Tr. 349).

23

Mr. Neims notes many areas of markedly severe limitations (Tr. 344), and as previously

24

discussed, see supra, section 1.e., p. 10-11, diagnosed plaintiff with "Impulse Control Disorder,

25

26

REPORT AND RECOMMENDATION - 23

1   NOS; Bipolar Disorder, NOS by history; Personality Disorder, NOS; and Polysubstance

2   Dependence, episodic" (Tr. 342).

3           Regarding the evidence provided by Mr. Neims, the ALJ included the following in his

4   decision:

5

6           Daniel Neims, Ph.D., also completed DSHS psychological evaluations. Dr.
            Neims opined that the claimant had marked limitations in several cognitive and
6           social factors (internal citation to Exhibit 20F). I have granted little probative
            weight to the DSHS evaluation[] as [it] is not as well documented and as
7           thorough as the consultative evaluations [performed by the State agency
            medical consultants]. Additionally, the DSHS evaluators did not have the
8           opportunity to review the claimant's record as the State agency consultants did.

9

10  (Tr. 24.) The Court already has discussed Mr. Neims' diagnoses of impulse control disorder and

11  personality disorder, see supra, section 1.e., p. 10-11, and found that the diagnoses were

12  significant probative evidence that the ALJ should have evaluated and discussed in his decision.

13  See Vincent, supra, 739 F.2d at 1394-95.

14

15          Based on a review of the relevant record, the Court now finds that the ALJ's conclusion

16  that Mr. Neims' evaluations are "not as well documented and as thorough as the consultative

17  evaluations [performed by the State agency medical consultants]" is erroneous and without

18  substantial evidence. See Bayliss, supra, 427 F.3d at 1214 n.1; see also Magallanes, supra, 881

19  F.2d at 750. To the contrary, Mr. Neims' evaluations are well-documented and very thorough.

20  The Court concludes that the ALJ did not provide legitimate reasons "supported by substantial

21
22  evidence in the record" for the little probative weight he gave to the evaluations by Mr. Neims.

23  See Lester, supra, 81 F.3d at 830-31; see also Bayliss, supra, 427 F.3d at 1214 n.1; Magallanes,

24  supra, 881 F.2d at 750.

25          e.   Trisha Holmeide, B.A., Mental Health Counselor.

26

Between July 19, 2007 and February 26, 2009, Trisha Holmeide, B.A., (hereinafter "Ms. Holmeide"), met with plaintiff on approximately twenty-one occasions. (Tr. 421-49.) During every one of these hour-long evaluations, Ms. Holmeide assessed plaintiff's mental status in areas such as affect, mood, thought process, orientation and behavior. For example, on July 19, 2007, Ms. Holmeide noted plaintiff's remarkable constricted affect; remarkable anxiousness and depression; remarkable disturbances with plaintiff's thought processes, including fabrications; as well as remarkable behavior, such as darting eyes, rapid tangential speech and agitated psychomotor activity. (Tr. 445.) At this evaluation, Ms. Holmeide assessed plaintiff as currently decompensating. (Id.)

On September 10, 2007, Ms. Holmeide noted plaintiff's blunted affect and depressive mood and assessed him as potentially decompensating. (Tr. 443.) Similarly, on September 27, 2007, Ms. Holmeide noted plaintiff's anxious, labile and depressed mood, remarkably depressive thought processes and rapid, non-stop speech and hand-tapping on the table. (Tr. 442.) She assessed plaintiff as potentially decompensating. (Id.)

On May 16, 2008, Ms. Holmeide noted plaintiff's remarkable intense affect; remarkable depressive, yet anxious mood; remarkable invasion of fear into his thought processes; as well as his remarkable loud, rapid speech and knee bouncing. (Tr. 433.) She also indicated that plaintiff currently was decompensating. (Id.) Similarly, on July 8, 2008, Ms. Holmeide noted plaintiff's confusion and slurring of words and opined that he was suffering from heat exhaustion. (Tr. 431.) Ms. Holmeide assessed plaintiff as currently decompensating. (Id.)

On August 25, 2008, Ms. Holmeide noted plaintiff's remarkable anxiety; paranoid thought processes; and psychomotor agitation. (Tr. 428.) She made similar findings on September 16, 2008. On September 23, 2008, Ms. Holmeide noted plaintiff's remarkably flat

REPORT AND RECOMMENDATION - 25

affect; his remarkably depressed mood; his remarkable depressive thought processes; and his remarkably rapid speech. (Tr. 426.) However, she considered plaintiff in this condition to be "improved." (Id.) Similarly, on September 26, 2008, Ms. Holmeide noted plaintiff's rapid, loud speech and continued psychomotor agitation, yet concluded he was "improved" and "cooperative and helpful, eager to locate housing." (Tr. 425.)

On October 7, 2008, Ms. Holmeide noted plaintiff's remarkable pensive affect; remarkably anxious mood; remarkable depressive thought process; and his inappropriate short, cryptic responses. (Tr. 423.) She assessed that plaintiff potentially was decompensating. (Id.) On February 3, 2009, Ms. Holmeide noted plaintiff reported that his doctor told him that he was "in [the] best health ever." (Tr. 422.)

Finally, on February 26, 2009, Ms. Holmeide noted plaintiff's remarkably limited range of affect; his hypomanic labile mood; his unclear thought processes; and his remarkably "extreme psychomotor agitation." (Tr. 421.) In this evaluation, she indicates plaintiff's report that he is "experiencing [the] same increased anxiety and psychomotor agitation as when [he] used meth[amphetamine]." (Id.) She assessed plaintiff as currently decompensating. (Id.)

The ALJ does not mention any of the evidence regarding assessments by Ms. Holmeide. In addition, in spite of Ms. Holmeide's assessment that plaintiff experienced episodes of decompensation on July 19, 2007 (Tr. 445), May 16, 2008 (Tr. 433), July 8, 2008 (Tr. 431), and February 26, 2009 (Tr. 421); and, that plaintiff potentially was decompensating on September 10, 2007 (Tr. 443), September 27, 2007 (Tr. 442); and October 7, 2008 (Tr. 423), the ALJ made the following findings:

> Repeated episodes of decompensation, each of extended duration, means three episodes within 1 year, or an average of once every 4 months, each lasting for at least 2 weeks. . . . . As for episodes of decompensation, the claimant has

1    experienced no episodes of decompensation, which have been of extended
     duration. The record does not support any episodes of decompensation.

2

3    (Tr. 20.)

4        The ALJ's conclusions regarding whether or not plaintiff suffered repeated episodes of

5    decompensation, each of extended duration; and whether or not the record supports any episodes

6    of decompensation are without substantial evidence.  See Bayliss, supra, 427 F.3d at 1214 n.1;

7    see also Magallanes, supra, 881 F.2d at 750. In addition, the Court finds that much of the

8    evidence by Ms. Holmeide, specifically including the evaluations of plaintiff's mental status and

9    assessments of plaintiff's episodes of decompensation, and potential episodes of

10

11   decompensation, are significant, probative evidence that the ALJ should have discussed in his

12   decision. See Vincent, supra, 739 F.2d at 1394-95.

13              f.    Non-examining state agency medical consultants

14       Regarding the opinions by the non-examining consultants, the ALJ indicated that:

15       On January 5, 2007, State agency medical consultant, Timothy Gregg, Ph.D.,
         assessed that the claimant was capable of performing simple, repetitive tasks
16       and sustaining a normal workweek. Dr. Gregg further assessed that the
         claimant was capable of relating appropriately to a supervisor and few
17       coworkers in a clean and sober work setting with minimal public contact
         (internal citation to Exhibit 12F). . . . .  On January 8, 2007 State agency
18       consultant, Julie Thumser-Kerlee, exertionally limited the claimant to the light
         level. Specifically, it was assessed that the claimant could . . . .  stand and/or
19       walk for about 6 hours in an 8 hour workday, and sit for a total of about 6
         hours in an 8 hour workday. . . .  [The ALJ noted that both of these
20       assessments were affirmed] . . . .  I have granted significant probative weight
21       probative weight to the State agency physical and mental assessments as they
         are consistent with the evidence of record considered in its entirety. Further,
22       the State agency consultants had the opportunity to review the majority of the
         record prior to their assessments and they are familiar with the Social Security
23       Disability program.

24

25   (Tr. 23.) Based on a review of the relevant record, the Court finds that the ALJ's conclusion that

26   the physical and mental assessments of the non-examining consultants are consistent with the

evidence of record considered in its entirety is not supported by substantial evidence in the record as a whole. See Bayliss, supra, 427 F.3d at 1214 n.1; see also Magallanes, supra, 881 F.2d at 750. Therefore, the ALJ's decision to grant significant probative weight to the assessments by the non-examining consultants based on this conclusion also was not supported by substantial evidence. Id.; see also Lester, supra, 81 F.3d at 831.

      3)  The ALJ erred in failing to consider properly plaintiff's testimony.

If the medical evidence in the record is not conclusive, sole responsibility for resolving conflicting testimony and questions of credibility lies with the ALJ. Sample v. Schweiker, 694 F.2d 639, 642 (9th Cir. 1999) (quoting Waters v. Gardner, 452 F.2d 855, 858 n.7 (9th Cir. 1971) (citing Calhoun v. Bailar, 626 F.2d 145, 150 (9th Cir. 1980))). Nevertheless, the ALJ's credibility determinations "must be supported by specific, cogent reasons." Reddick v. Chater, 157 F.3d 715, 722 (9th Cir. 1998) (citing Andrews v. Shalala, 53 F.3d 1035, 1039 (9th Cir. 1995)). If an ALJ discredits a claimant's subjective symptom testimony, the ALJ must articulate specific reasons for doing so. Greger v. Barnhart, 464 F.3d 968, 972 (9th Cir. 2006).  In evaluating a claimant's credibility, the ALJ cannot rely on general findings, but "'must specifically identify what testimony is credible and what evidence undermines the claimant's complaints.'" Id. at 972 (quoting Morgan v. Comm'r of Soc. Sec. Admin., 169 F.3d 595, 599 (9th Cir. 1999)); Reddick, 157 F.3d at 722 (citations omitted); Smolen v. Chater, 80 F.3d 1273, 1284 (9th Cir. 1996) (citations omitted). The ALJ may consider "ordinary techniques of credibility evaluation," including the claimant's reputation for truthfulness, inconsistencies in testimony, daily activities, and "unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment." Smolen, 80 F.3d at 1284. The decision of the ALJ

should "include a discussion of *why* reported daily activity limitations or restrictions are or are not reasonably consistent with the medical and other evidence." SSR 95-5p 1995 SSR LEXIS 11 (emphasis added).

The determination of whether to accept a claimant's testimony regarding subjective symptoms requires a two-step analysis.  20 C.F.R. §§ 404.1529, 416.929; <u>Smolen</u>, 80 F.3d at 1281 (*citing* <u>Cotton v. Bowen</u>, 799 F.2d 1403 (9th Cir. 1986)).  First, the ALJ must determine whether there is a medically determinable impairment that reasonably could be expected to cause the claimant's symptoms. 20 C.F.R. §§ 404.1529(b), 416.929(b); <u>Smolen</u>, 80 F.3d at 1281-82. Once a claimant produces medical evidence of an underlying impairment, the ALJ may not discredit the claimant's testimony as to the severity of symptoms "based solely on a lack of objective medical evidence to fully corroborate the alleged severity of pain." <u>Bunnell v. Sullivan</u>, 947 F.2d 341, 343 (9th Cir. 1991) (*en banc*) (*citing* <u>Cotton</u>, 799 F.2d at 1407).  Absent affirmative evidence that the claimant is malingering, the ALJ must provide "clear and convincing" reasons for rejecting the claimant's testimony. <u>Smolen</u>, 80 F.3d at 1283-84; <u>Reddick</u>, 157 F.3d at 722 (*citing* <u>Lester v. Chater</u>, 81 F.3d 821, 834 (9th Cir. 1996); <u>Swenson v. Sullivan</u>, 876 F.2d 683, 687 (9th Cir. 1989)).

In his decision, the ALJ included the following, among other reasons, for his adverse credibility determination:

> An important factor in considering credibility is compliance [with] treatment recommendations made by treating or examining physicians. Failure to comply can be an indication of symptoms being less severe than alleged. Treatment records reveal that the claimant has difficulty with medication compliance and keeping appointments (internal citation to Exhibit 23F/3). The claimant also admitted that he is not complaint with his medication regimen (internal citation to Exhibit 5F/8). The claimant's non-compliance indicates lack of credibility.

(Tr. 22.)

1    First, the Court notes that the ALJ erred when he referenced "claimant['s] difficulty with
2    medication compliance and keeping appointments" and thereby concluded that plaintiff's "non-
3    compliance indicates lack of credibility." (Tr. 22.) Although it is often the case that a claimant's
4    failure to comply with prescribed treatment calls into question the severity of the claimant's
5    symptoms, this generally is because such failure suggests that the claimant willfully is failing to
6    submit to medical treatment because he or she wishes to remain disabled and receive benefits, or
7    because he or she is not suffering from that severe of an impairment if not doing everything
8    possible to remedy it. See 20 C.F.R. § 404.1530 ("If you do not follow the prescribed treatment
9    without a good reason, we will not find you disabled"); see also SSR 96-7 1996 SSR LEXIS 4, at
10   *21-*22 ("the individual's statements may be less credible if the level or frequency of treatment
11   is inconsistent with the level of complaints . . . .  and there are no good reasons for this
12   failure"); but see Nichols v. Califano, 556 F.2d 931, 932 (9th Cir. 1977) (even if a condition
13   could be remedied by surgery, if the claimant's "actions were reasonable under the
14   circumstances, then the district court's judgment upholding the [written decision by the ALJ]
15   must be reversed"). In addition, a good reason can provide a valid excuse for not following
16   prescribed treatment, such as that a treating family physician does not recommend the treatment,
17   or that it can be painful or dangerous. 20 C.F.R. § 404.1530; SSR 96-7 1996 SSR LEXIS 4, at
18   *21-*22; Nichols, supra, 556 F.2d at 933.
19
20        When mental illness is involved, assuming that a failure to comply with prescribed
21   treatment suggests a *willful* failure to comply with prescribed treatment can be illogical. This is
22   in part because a person suffering from a mental illness may not realize that he needs his
23   medication, or he may not realize even that his "condition reflects a potentially serious mental
24   illness." Van Nguyen, supra, 100 F.3d at 1465. "'[I]t is a questionable practice to chastise one

REPORT AND RECOMMENDATION - 30

1  with a mental impairment for the exercise of poor judgment in seeking rehabilitation.'" <u>Id.</u>

2  (*quoting* with approval, <u>Blankenship v. Bowen</u>, 874 F.2d 1116, 1124 (6th Cir. 1989)). Here,

3  plaintiff testified at his May 21, 2009 hearing that he "didn't even know [he] had a lot of these

4  diseases  .  .  .  .  [b]ut since  .  .  .  .  getting on the maintenance program [he] started realizing how

5  sick[he] was." (Tr. 32-33.)

6

7      When a person suffers from a mental illness, especially a severe one such as the severe

8  bipolar disorder suffered by plaintiff here, (<u>see</u> Tr. 225, 229), and the mentally ill person does not

9  have the requisite insight into his or her condition, or does not have the memory and focus to

10  have the ability to take a medication three times a day, this fact actually can indicate a *greater*

11  severity of mental incapacity. <u>See</u> <u>Van Nguyen</u>, <u>supra</u>, 100 F.3d at 1465; <u>see also</u> <u>Blankenship</u>,

12  <u>supra</u>, 874 F.2d at 1124. Such a conclusion is indicated here, as Dr. Cosgrove concluded that

13  plaintiff "is not compliant with [Lithium] treatment and again is unaware of this." (Tr. 225 (lack

14  of insight into condition, consistent with substantial evidence in the record).) In addition, the

15  reference on which the ALJ relies for his determination on this credibility issue also supports the

16  conclusion of greater severity, as Nurse Langley indicated that plaintiff's "difficulty with

17  medication compliance and keeping appointments would keep it a challenge for him to maintain

18  adequate labs to dose lithium safely." (Tr. 419-20 (inability to comply with strict requirement of

19  three doses a day, consistent with substantial evidence in the record).) The implication from both

20  Nurse Langley and Dr. Cosgrove is that plaintiff is incapable of following some of his prescribed

21  treatment, not that plaintiff willfully is making the deliberate decision to refrain from following

22  through with his treatment. (<u>See</u> Tr. 225, 419-20.) Even the words chosen by the ALJ support

23  this conclusion, <u>i.e.</u>, "the claimant has difficulty with medication compliance and keeping

24  appointments." (Tr. 22.) Therefore, the Court concludes that plaintiff's inability to follow

25

26

REPORT AND RECOMMENDATION - 31

1    through with his prescribed treatment due to his mental illness in this case was a "good reason."

2    See 20 C.F.R. § 404.1530; SSR 96-7 1996 SSR LEXIS 4, at *21-*22; see also Nichols, supra,

3    556 F.2d at 932. As such, the ALJ's finding regarding plaintiff's credibility is based, at least in

4    part, on a conclusion that is contrary to law. See 20 C.F.R. § 404.1530; SSR 96-7 1996 SSR

5    LEXIS 4, at *21-*22; see also Nichols, supra, 556 F.2d at 932.

6
7            In addition, according to Social Security Ruling, (hereinafter "SSR"), SSR 96-7:

8            the adjudicator must not draw any inferences about an individual's symptoms
             and their functional effects from a failure to seek or pursue regular medical
9            treatment without first consideration any explanations that the individual may
             provide, or other information in the case record, that may explain infrequent or
10           irregular medical visits or failure to seek medical treatment.

11   SSR 96-7 1996 SSR LEXIS 4, at *22. The ALJ did not comply with this Ruling by the Social

12   Security Administration. See id.

13
14           The Court has included in this Report many references to the record that could be

15   interpreted as reflecting negatively on plaintiff's credibility. However, the majority of these

16   references were not mentioned by the ALJ in his written decision, and furthermore, the evidence

17   supplied by the Court largely exists in medical opinion evidence either disregarded entirely by

18   the ALJ, or given little probative weight by the ALJ. In addition, "regardless whether there is

19   enough evidence in the record to support the ALJ's decision, principles of administrative law

20   require the ALJ to rationally articulate the grounds for h[is] decision and [the courts] confine our

21   review to the reasons supplied by the ALJ." Steele v. Barnhart, 290 F.3d 936, 941(7th Cir. 2002)

22   (citing SEC v. Chenery Corp., 318 U.S. 80, 93-95 (1943); Johnson v. Apfel, 189 F.3d 561, 564

23   (7th Cir. 1999); Sarchet v. Chater, 78 F.3d 305, 307 (7th Cir. 1996)); see also Griemsmann v.

24
25   Astrue, 147 Soc. Sec. Rep. Service 286, 2009 U.S. Dist. LEXIS 124952 at *8, (W.D.Wash.

26

REPORT AND RECOMMENDATION - 32

2009) (J. Theiler) (*citing* <u>Blakes v. Barnhart</u>, 331 F.3d 565, 569 (7th Cir. 2003)), *adopted by* 147 Soc. Sec. Rep. Service 286, 2009 U.S. Dist. LEXIS 98985 (2009) (J. Zilly).

Finally, as already discussed, <u>see supra</u>, sections 1 and 2, the Court also notes that medical evidence supporting plaintiff's allegations of pain and his other physical and mental limitations due to his impairments and symptoms exist within the record and were not evaluated properly by the ALJ. <u>See supra</u>, sections 1 and 2.

Although the Court notes that the ALJ provided reasons in his decision in support of his determination regarding plaintiff's credibility other than plaintiff's failure to follow prescribed treatment, (<u>see</u> Tr. 22-23), the Court nevertheless concludes that the ALJ's reasons for rejecting plaintiff's testimony are not "clear and convincing." <u>See</u> <u>Smolen</u>, <u>supra</u>, 80 F.3d at 1283-84; <u>Reddick</u>, <u>supra</u>, 157 F.3d at 722.

Therefore, on remand, the ALJ should reevaluate plaintiff's credibility subsequent to a proper evaluation of all of plaintiff's limitations due to all of his impairments as well as a proper review of the medical evidence in the record as a whole. As already discussed, the ALJ should not base his credibility assessment in this case on any impairment regarding plaintiff's ability to comply with prescribed treatment. <u>See</u> <u>Van Nguyen</u>, <u>supra</u>, 100 F.3d at 1465; <u>see also</u> <u>Nichols</u>, 556 F.2d at 932.

4)  <u>The ALJ erred in his assessment of plaintiff's residual functional capacity.</u>

The ALJ's assessment of plaintiff's residual functional capacity was based on an improper evaluation of the record, plaintiff's testimony, and the medical evidence. <u>See supra</u>, sections 1-3. Therefore, the Court concludes that following remand, if necessary, the ALJ should reevaluate plaintiff's residual functional capacity in light of his revised assessment of plaintiff's medical conditions.

1

2      5)   Defendant failed to meet his burden to show that plaintiff could perform any work in

3          the national economy.

4      The ALJ's conclusion regarding plaintiff's ability to perform work existing in the

5  national economy was based on an improper evaluation of the record as a whole. See supra,

6  sections 1-4. Therefore, the Court concludes that Defendant did not meet his burden to show that

7  plaintiff could perform any work in the national economy.

8

9      Following remand, the ALJ should, if necessary, evaluate anew plaintiff's ability to

10 perform work existing in the national economy.

11

12     6)   This matter should be remanded to the Administration for further consideration.

13     Plaintiff also contends that this matter should be remanded for an award of benefits. The

14 Ninth Circuit has put forth a "test for determining when evidence should be credited and an

15 immediate award of benefits directed." Harman v. Apfel, 211 F.3d 1172, 1178 (9th Cir. 2000). It

16 is appropriate where:

17
           (1) the ALJ has failed to provide legally sufficient reasons for rejecting
18         such evidence, (2) there are no outstanding issues that must be resolved
           before a determination of disability can be made, and (3) it is clear from
19         the record that the ALJ would be required to find the claimant disabled
           were such evidence credited.
20

21 Harman, 211 F.3d at 1178 (quoting Smolen v. Chater, 80 F.3d 1273, 1292 (9th Cir.1996)).

22     On January 23, 2009, Nurse Nelson made the assessment "that [plaintiff] may more

23 appropriately [be] diagnosed with a recurrent depression and attention deficit/hyperactivity

24 disorder with residual hyperactivity than with bipolar disorder." (Tr. 452.) This assessment has

25 some support in the record and the Court also notes that diagnoses of bipolar disorder, as well as

26 those of ADHD and/or impulse control disorder, may have been based, in part, on observations

REPORT AND RECOMMENDATION - 34

1   of plaintiff's symptoms more correctly caused by the undisclosed influence of methamphetamine

2   and/or other substances plaintiff is known to have used and/or abused.  (See, e.g., Tr. 253, 262,

3   420, 448, 469, 470, 485 (diagnoses of "alcohol dependence, severe; cannabis dependence,

4   moderate; methamphetamine dependence, severe; cocaine, hallucinogen and opioid [e.g., heroin]

5   abuse by history").) Plaintiff admitted at his hearing that he "was just telling [treatment

6   counselors at] [B]HR [Behavioral Health Resources] that [he] wasn't doing meth and alcohol"

7

8   when, in fact he was doing both and "was in denial." (Tr. 43, 469, 470.) However, plaintiff

9   admits use of methamphetamine only "once or twice" after 2002. (Tr. 469.)

10      The Court also notes that at least one health care provider noted plaintiff's

11  "manipulative" behavior and his "bargaining to get support for easiest way out of legal troubles."

12  (Tr. 444.) Perhaps the assessments that plaintiff's symptoms "continue when clean and sober"

13  are correct (see, e.g., Tr. 262, 269, 452), and perhaps the evaluators simply were unaware of

14  existing drug use (see, e.g., Tr. 43, 269 ("more likely to respond to [treatment] if he stops

15  using"), 417 (plaintiff "denies a history of psychotic symptoms other than when under the

16

17  influence of substances")). Evaluations in the record do not appear to be supported by negative

18  toxicology reports.

19      Because of these complications due to undisclosed drug use, the Court concludes that

20  although the ALJ did not evaluate properly the medical evidence and did not give appropriate

21

22  reasons for rejecting certain medical opinions, see supra, sections 1 and 2, the medical opinions

23  should not be credited as a matter of law. See Lester v. Chater, 81 F.3d 821, 834 (9th Cir. 1995)

24  ("Where the Commissioner fails to provide adequate reasons for rejecting the opinion of a

25  treating or examining physician, we credit that opinion 'as a matter of law'") (quoting Hammock

26  v. Bowen, 879 F.2d 498, 502 (9th Cir. 1989)) (other citation omitted). Therefore, outstanding

issues must be resolved. <u>See</u> <u>Smolen</u>, <u>supra</u>, 80 F.3d at 1292. In addition, the medical evidence

contains contradictions and is not conclusive. <u>See</u> <u>Sample v. Schweiker</u>, 694 F.2d 639, 642 (9th

Cir. 1999) (*quoting* <u>Waters v. Gardner</u>, 452 F.2d 855, 858 n.7 (9th Cir. 1971) (*citing* <u>Calhoun v.</u>

<u>Bailar</u>, 626 F.2d 145, 150 (9th Cir. 1980))) (if the medical evidence in the record is not

conclusive, sole responsibility for resolving conflicting testimony and questions of credibility

lies with the ALJ). For these reasons, remand is appropriate.

CONCLUSION

The ALJ incorrectly characterized medical evidence, made erroneous conclusions based

on the medical evidence, failed to discuss significant probative evidence and failed to provide

specific and legitimate reasons supported by substantial evidence in the record for his rejection

of medical evidence supplied by treating and examining medical sources. Therefore, this matter

should be reversed and remanded to the Administration for further consideration, beginning at

step 2 of the sequential disability evaluation.

Pursuant to 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b), the parties shall have

fourteen (14) days from service of this Report to file written objections.  <u>See also</u> Fed. R. Civ. P.

6.  Failure to file objections will result in a waiver of those objections for purposes of de novo

review by the district judge. <u>See</u> 28 U.S.C. § 636(b)(1)(C). Accommodating the time limit

imposed by Rule 72(b), the clerk is directed to set the matter for consideration on March 11**,**

2011, as noted in the caption.

Dated this 15th day of February, 2011.

J. Richard Creatura
United States Magistrate Judge

REPORT AND RECOMMENDATION - 36